## Case No. 9,952.

MURPHY v. PAYNTER et al.

[1 Dill. 333.] [1]

Circuit Court, D. Nebraska. 1871.

EQUITY—DURESS—PERMANENT IMPROVEMENTS—DELAY.

1. Equity views with disfavor, unreasonable and unexplained delay in the assertion of rights, especially where the rights depend on oral evidence and the situation and value of the property affected have, in the meantime, greatly changed.

2. Accordingly, a bill to set aside a deed for duress, alleged to have been practised twelve years before, was dismissed,—the complainant being without sufficient excuse for the delay, and the defendant having made costly and permanent improvements upon the property, and the evidence as to the duress being conflicting and unsatisfactory.

The bill was filed on the 1st day of October, 1869, and sets forth that on the 17th day of July, 1857, the complainant entered, by virtue of a pre-emption, under the act of 1841, a tract of land in Sarpy county, Nebraska, and received a duplicate therefor, and that on the same day he was forced by one Jesse Lowe (husband of the defendant, Sophia Lowe), and by the defendant Paynter and others, by insolence and by threats of great bodily harm, to execute a deed therefor to Paynter and Sophia Lowe, on receiving, against his will and when under duress, the sum of one hundred dollars. It is alleged that the defendants were aided in their illegal proceedings against the complainant by members of the "Omaha Land Claim Club;" that from fear of this organization the complainant left the state, and was prevented from instituting legal proceedings to recover the land until after the death of Jesse Lowe, in 1868. The prayer is that the deed so made, on the 17th day of July, 1857, be set aside. The answer admits the complainant's purchase of the land at the land office, but alleges it was with money furnished to him by Lowe and Paynter, for whose benefit it was purchased. It denies any coercion, or duress, or fear of bodily harm, but alleges that the deed was voluntarily made in pursuance of a previous understanding between the parties, and in consideration of $100 paid therefor at the time. A large amount of testimony has been taken on either side. It is very conflicting, and many parts of it are incapable of being reconciled.

Baldwin & O'Brien, for complainant.
J. M. Woolworth, for respondent.

Before DILLON, Circuit Judge, and DUNDY, District Judge.

DILLON, Circuit Judge. In the spring of 1857, the complainant came to Omaha, and soon afterwards hired himself as a laborer, by the month, to Jesse Lowe. There is evidence of plaintiff's admission that he was to have so much per month for his services, and

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

was to pre-empt for Lowe a piece of land. Lowe and Paynter were relatives by marriage, were in business together, and each had pre-emptions in his own name, on other land than that now in question. Hence, neither Lowe nor Paynter could pre-empt this land in his own name. The evidence is very satisfactory that the land now in controversy had been built upon, plowed, and, to some extent, fenced by Paynter and Lowe and those whose claim thereto they had purchased, and that these improvements were made in 1856, and before July, 1857. Lowe, while the complainant was in his service, sent him to this land a short time before July, 1857, and he continued in the service of Lowe down to the date of the entry.

The complainant testifies that this land was vacant when he went there, in May or June, 1857, that he plowed part of it, built a house on it, and bought the lumber therefor of Paynter. In all these particulars the weight of evidence and the circumstances, are strongly against him.

On the 17th day of July he entered the land, Paynter being his witness to prove up the pre-emption. The complainant says he purchased this land with his own money, with gold which he brought to Nebraska with him. On the other hand, the defendants claim that the complainant paid for the land with money furnished by Lowe and Paynter.

The complainant testifies that he paid for it with his own money. On the other hand, Paynter testifies that he saw Lowe pay Murphy the money with which to make payment at the land office, and that the money belonged to him and Lowe together.

The witness, Carlisle, here corroborates Paynter. He testifies that on the day Murphy proved up his pre-emption and made the entry, he saw Lowe give him the money, in Omaha, with which to make the payment at the land office. The payment was made and the certificate received in the name of the complainant. On the afternoon of that day occurred the transaction, in the course of which the complainant made the deed of the land to the defendants, which he is now seeking to have set aside because made under duress. Respecting this transaction the conflict in the testimony is painful and perplexing to the last degree. The complainant's version is, that on the same day on which he made the entry and received the certificate, he was passing the office of Lowe, in Omaha, when Lowe accosted him and demanded the duplicate and a deed, and that, upon complainant's refusal, Lowe, aided by Paynter and others, members of the Land Claim Club, forced him into his office, or forcibly kept him there, stripped and searched him, maltreated him, and threatened his life if he did not make the deed required of him; that they compelled him to receive $100 against his will, and that he received the money and made the deed only to save his life, or his person from great bodily injury.

I feel bound to say that I find some of the features of this version of the transaction not a little confirmed by other witnesses than the plaintiff. The defendant's theory of the transaction is this: that at the time in question the complainant was passing by the office of Lowe as he claims; that Lowe casually saw him and assumed, as a matter of course, that he would carry out the understanding and make a deed for the land; that on his refusal, a dispute arose; that the only crowd that gathered around was that which a dispute and conflict on the street would naturally assemble; that the stand taken by the complainant was, not that he would not make a deed for the land at all, but that he would not do so until he was paid by Lowe his wages in full, and the sum of one hundred dollars for his services in connection with proving up the pre-emption.

The defendants claim that though the complainant at one time endeavored to get out of the office and was forcibly detained by Lowe and some others, yet that he was not put in bodily fear, but on the contrary dictated the terms on which he was willing to make the deed, namely, payment for his services as a laborer for Lowe, and the receipt of one hundred dollars in addition; and that these terms were accepted by Lowe and the deed drawn accordingly, and voluntarily executed by the complainant, and the money voluntarily received by him.

In this account of the transaction the witnesses, Paynter, Miller, Carlisle, and Woolworth each substantially agreed. Against it, are the direct and positive statements of the complainant, in which, as to some particulars, though not in all, he is corroborated by the witnesses, Robertson, Knight, and Hannigan.

In this conflict of testimony, other circumstances must be regarded by the court in determining the cause. One of the most important of these, and, in my judgment, the controlling one, is the long delay of the complainant to seek relief. The deed which he is asking to impeach, was made by him, July 17, 1857. This bill was not filed until October 1, 1869, more than twelve years after the execution of the deed. This delay is not satisfactorily explained. The explanation given is that he feared the club, and was thus prevented from bringing suit until after the death of Lowe in 1868. The club ceased as an organization with the year 1857, and ever since then, if not always, it has been perfectly safe for the plaintiff to seek redress in the courts. This delay tends strongly to confirm the defendant's theory of the case, because if that theory be correct, the delay is consonant with it, while it is inconsistent with the plaintiff's theory of it.

But aside from this consideration, as affecting the probabilities of the transaction occurring when the deed was made, there is another which I confess has had much weight with me in reaching, after some hesitation, the conclusion that the bill must be dismissed.

During the lapse of this long period, not only has the land itself greatly advanced in value, but it has been largely improved by the defendant, Paynter, who has constantly cultivated it, and for the past few years made it his home. These improvements are permanent in their nature, and consist of houses, barns, fences, ditches, fruit trees, and plantations of other trees, &c., and cost and are worth about the sum of ten thousand dollars, an amount much exceeding, it is probable, the value of the land itself.

If the plaintiff gets the land, he gets these improvements as well, to which he has of course no equity, since he is not obliged and cannot be decreed to make any compensation therefor, and since he laid by, without adequate cause, and saw the defendant make them upon the faith of his deed.

From the view I take of the cause, after twice carefully reading all the proofs, I think it quite probable that the plaintiff might have had a decree if he had made the same case upon suit brought recently after the transaction. But where the delay is so protracted, the change in the situation of the property so great, and the conflict in the evidence so radical, engendering doubts so grave as to the real character of the circumstances under which the deed was made, and in view of the clear case which the law ever requires to be established in order to set aside the solemn deed of the party, I can see no course fairly open, but to order the bill to be dismissed. Decree accordingly.